## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NOREE KAMKONGKAEO** | ) |
| | ) |
| **and** | ) |
| | ) |
| **JAMES DUNCAN,** | ) Case No. 1:20cv1058 |
| | ) |
| Plaintiffs, | ) **JURY TRIAL DEMANDED** |
| | ) |
| v. | ) |
| | ) |
| **ISLAMIC REPUBLIC OF IRAN** | ) |
| Serve:    Foreign Minister Mohammed Zarif | ) |
|                Ministry of Foreign Affairs | ) |
|                Khomeini Avenue | ) |
|                United Nations Street | ) |
|                Tehran, Iran | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

NOW COME the Plaintiffs, NOREE KAMKONGKAEO and JAMES DUNCAN (collectively referred to herein as "Plaintiffs"), by counsel, and for their Complaint against Defendant, the Islamic Republic of Iran ("Iran"), arising out of the terrorist attack in Afghanistan on January 4, 2016, state as follows:

**I.    THE PARTIES**

1. Ryan Hammons is a victim of the January 4, 2016 bombing. He is not a party to this action, but he is a plaintiff in a related matter pending before this Court identified by Case Number: 1:19cv2518.

2. Plaintiff Noree Kamkongkaeo lives with Ryan Hammons and has been the functional equivalent of his spouse since at least 2010.

3. Plaintiff James Duncan is the uncle of Ryan Hammons and has been the functional equivalent of his father since at least 2000.

4. Defendant, Iran, is a foreign state. Since January 19, 1984, Iran has been designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

## II. JURISDICTION AND VENUE

5. Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), 1367, and 1605A.

6. Despite its status as a foreign state, Defendant is subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due to Iran's longstanding designation as a "State Sponsor of Terrorism."

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

8. At the time of the January 4, 2016 attack, Ryan Hammons was a citizen of the United States of America.

## III. NATURE OF THE ACTION

9. On January 4, 2016, at 6:34pm local time, a truck containing over three thousand pounds of explosives was detonated outside of Camp Sullivan, a property located near the Kabul International Airport and used to house United States embassy personnel (the "Camp Sullivan Attack"). The explosion wounded more than thirty people, including Ryan Hammons.

10. The Taliban claimed responsibility for the attack.

11. The Camp Sullivan Attack was the product of a broader conspiracy between the Taliban and Iran to attack American interests in Afghanistan with violent acts of terrorism.

12. Iran has long served as a co-conspirator with the Taliban. The Iranian regime leverages that relationship to advance its goal of expanding its influence in Afghanistan by fostering political instability and pressuring American leaders to withdraw military forces.

13. To carry out the Camp Sullivan Attack, Taliban operatives needed financial support, training in the use of explosives and tactics, freedom to travel across the border with Iran, and access to explosive materials. Iran has consistently provided the Taliban with each of these types of support since at least 2007.

14. By knowingly and intentionally providing material support and resources to enable and assist the Taliban in carrying out acts of terrorism, Iran is liable for the damages suffered by Plaintiffs as a direct and proximate result of the Camp Sullivan Attack.

## IV. FACTUAL ALLEGATIONS

### A. Iran's Substantial and Pervasive Support for International Terrorism

15. Since the Iranian revolution in 1979, Iran has engaged in and supported terrorist organizations and acts of terrorism as an instrument of its foreign policy.

16. Iran's widespread support for terrorist groups, such as Hezbollah, Hamas, and the Taliban, is well-documented. As a result, the State Department has designated Iran as a state sponsor of terrorism since 1984.

17. Iran carries out its support of terrorism, in large part, through the Islamic Revolutionary Guard Corps ("IRGC"), which is a military force parallel to the regular Iranian military. The IRGC is supervised by the Iranian Parliament but operates as an agent and instrumentality of the Supreme Leader of Iran, Ayatollah Ali Hoseini Khamenei. The Supreme Leader serves as commander and chief of the armed forces, appoints the head of each military

service, declares war and peace, appoints the head of the judiciary, and may dismiss the elected president of Iran at any time.

18. The IRGC also has a constitutional role as the defender of the Islamic Revolution and owns or controls hundreds of companies, particularly those in the oil and gas, engineering, telecommunications, and infrastructure sectors, and holds billions of dollars in military business and other government contracts.

19. On April 15, 2019, the IRGC was formally designated by the State Department as a Foreign Terrorist Organization.

20. The IRGC has a special foreign division, known as the Quds Force ("IRGC-QF"), which is the branch of the IRGC primarily used to promote and support terrorism abroad. The IRGC-QF has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing, and is one of the most organized, disciplined, and deadly organizations in the world.

21. The IRGC-QF provides funding and training for terrorism operations targeting American citizens, including support for terrorist organizations like Hezbollah, al Qaeda, and the Taliban. These activities are known and sanctioned by Iran's Supreme Leader and are an official platform of Iran's foreign policy.

22. Accordingly, pursuant to Executive Order 13224, the Treasury Department has designated the IRGC-QF as a "terrorist organization" and the State Department has designated the IRGC-QF as a "foreign terrorist organization."

23. Iran also supports terrorism through its Ministry of Information and Security ("MOIS"), which is an intelligence agency with an annual budget of between $100 million and

$400 million. Like the IRGC-QF, MOIS has been involved in kidnappings, assassinations, and other acts of terrorism since its inception.

      **B.**      **The Development of the Iran-Taliban Relationship**

24.     Although the Iranian regime is Shia and the Taliban is a Sunni organization, those religious differences do not and have not kept them from conspiring together in terrorist activities.

25.     Iran first provided limited support to Sunni Afghan groups during the Soviet-Afghan War, where its primary goal was to resist the expansion of communist and Western influence in the region. Its support to these groups in the fight against Russian forces was often conditioned on the adoption of anti-American positions and Iran condemned any reliance on Western-supplied weapons during the conflict.

26.     During this time, Ayatollah Khomeini, Iran's Supreme Leader until his death in 1989, publicly stated that Iran should welcome all Afghans, including Sunnis, particularly because of their common enemies.

27.     Historically, however, the relationship between Iran and the Taliban was a contentious and violent one. Following the withdrawal of Soviet troops in 1989, Afghanistan was engulfed in civil war for much of the 1990s. On one side of that conflict were Shia militias, whom Iran actively supported with the hope of establishing a friendly Shia government on its eastern border. This effort was ultimately unsuccessful, however, as by 1996 the Taliban had secured control over most of Afghanistan and largely eradicated the Shia forces.

28.     Tensions between Iran and the Taliban peaked in August 1998 when Taliban forces captured the city of Mazar-I Sharif in northwestern Afghanistan. After capturing the city, the Taliban targeted ethnic Shia individuals for execution. Among those killed were eight Iranian

consulate officials and an Iranian journalist, whom the Taliban later claimed had been operating as intelligence officers.

29.     This tense dynamic between Iran and the Taliban dramatically shifted after September 11, 2001 and the subsequent American-led invasion of Afghanistan. For the first time since the Soviet-Afghan War, the two sides had common ground in opposing the rapid growth of foreign influence in the region.

30.     In fact, groundwork for this shift had begun forming prior to the 9/11 attacks. In January 2001, a Taliban delegation met with senior Iranian officials to discuss various military and political matters. One such topic was "Iran's purported desire to see the Taliban join the Northern Alliance in order to defend Afghanistan" in the event of an American invasion. *See Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 36 (D.D.C. 2011).

31.     As soon as October 2001, members of the IRGC were already meeting with the Taliban to offer them military support and resources. Iran instigated this meeting and it was held on the Iranian side of the border with Afghanistan. *Id.* at 37. This gathering officially ushered in a new era of cooperation between Iran and the Taliban.

32.     As part of this initial offer of support, Iran pledged to sell advanced military equipment to the Taliban for use against Americans, bragged of their ability to track US military forces, and promised "to open their border to Arabs entering Afghanistan." Iran also "offered to broker a peace between the Taliban and the Northern Alliance so Muslims could unite against the United States." *Id.* at 38.

33.     Shortly before Coalition air strikes began in 2001, Iran sent a high-ranking official to offer sanctuary to Taliban leaders. Those who travelled to Iran were allowed to move freely across the Iran-Afghanistan border to recruit fighters and inflict damage on Afghan and

Coalition interests. The IRGC offered these same Taliban forces cash rewards for the killing of Afghan officials or American soldiers.

34. In February 2002, then Director of Central Intelligence, George J. Tenet, testified before Congress that "initial signs of Tehran's cooperation and common cause with us in Afghanistan are being eclipsed by Iranian efforts to undermine US influence there. While Iran's officials express a shared interest in a stable government in Afghanistan, its security forces appear bent on countering the US presence."

35. In March 2007, a shipment of Iranian-made weapons bound for the Taliban was captured by American forces inside Afghanistan. This shipment included mortars and plastic explosives bearing markings indicating that they were manufactured in Iran.

36. In January 2009, the official spokesman for the Pentagon stated that the United States had observed Iranian support in Afghanistan.

37. On August 30, 2009, U.S. Army General Stanley McChrystal, the commander of American forces in Afghanistan, referred to Iran's role in Afghanistan at that time as "ambiguous." While Iran appeared to support the development of the new government in Kabul, the IRGC-QF was training Taliban fighters "and providing other forms of military assistance to insurgents." He noted that "Iran has the capability to threaten the mission in the future."

38. In December 2009, intelligence officials from the United Arab Emirates reported to the Treasury Department that Iran was supporting the Taliban financially, providing them weapons, helping the Taliban to smuggle narcotics, and facilitating the movement of Taliban members. It was specifically noted that the IRGC and the Iranian Navy were involved in the provision of these various forms of material support to the Taliban.

39. In March 2010, a Taliban commander was quoted as saying of Iran, "our religions and our histories are different, but our target is the same – we both want to kill Americans."

40. In May 2010, Gen. McChrystal stated publicly that Iran was providing material support to the Taliban. He explained "[t]he training that we have seen occurs inside Iran with fighters moving inside Iran" and that there is "clear evidence of Iranian activity, in some cases of providing weapons and training to the Taliban that is inappropriate."

41. On August 3, 2010, the United States Department of the Treasury designated General Hossein Musavi and Colonel Hasan Mortezavi for their roles in supporting the Taliban. General Musavi was the leader of the Ansar Corps, the branch of the IRGC-QF responsible for carrying out activities within Afghanistan. Colonel Mortezavi is a senior officer in the IRGC-QF. The Treasury Department found that both General Musavi and Colonel Mortezavi, acting in their official roles, had provided "financial and material support to the Taliban." In that same report, the Treasury Department concluded that "the IRGC-QF provides select members of the Taliban with weapons, funding, logistics and training."

42. On February 5, 2011, British troops intercepted a weapons shipment of rockets to the Taliban. British foreign secretary William Hague stated about the shipment that "detailed technical analysis, together with the circumstances of the seizure, leave us in no doubt that the weaponry recovered came from Iran."

43. On March 7, 2012, the Treasury Department designated IRGC-QF General Gholamreza Baghbani as a Specially Designated Narcotics Trafficker. General Baghbani, acting in his official role as a senior IRGC-QF officer, facilitated a drug smuggling ring that involved the shipment of opium from Afghanistan into Iran in exchange for weapons. The drug smugglers working on behalf of General Baghbani would deliver weapons directly to the Taliban.

44. In April 2012, the Department of Defense provided Congress with its Annual Report on Military Power of Iran and stated that the "active sponsorship of terrorist and insurgent groups, such as Lebanese Hizballah, Iraqi Shia groups, and the Taliban, are tools Iran uses to increase its regional power." The Report further explained that even though Iranian "support to the Taliban is inconsistent with their historic enmity, it complements Iran's strategy of backing many groups to maximize its influence while also undermining U.S. and [NATO] objectives by fomenting violence." By means of "the IRGC-QF, Iran provides material support to terrorist or militant groups such as . . . the Taliban."

45. The United States Department of State concluded that, in 2012, "the IRGC-QF trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets." The State Department further stated that arms transfers to the Taliban from Iran, including plastic explosives, had been going on since 2006.

46. By July 2012, Iran had allowed the Taliban to open an office in Zahedan, Iran.

47. On February 6, 2014, the Treasury Department designated two more IRGC-QF officers, Alireza Hemmati and Akbar Seyed Alhosseini, for their role in "supporting terrorism in Afghanistan and funneling Iranian assistance to the Taliban." This support included the provision of "logistical assistance" to an associate responsible for planning and executing terrorist attacks.

48. Early in 2014, Iran allowed the Taliban to open an office in Mashhad, Iran.

49. On May 27, 2014, President Obama announced that American combat operations in Afghanistan would end by December 2014 and that troop levels would be significantly reduced by that time. In anticipation of this troop withdrawal, Iran greatly accelerated its support for the Taliban in 2014 and 2015.

50. In June 2015, approximately six months before the Camp Sullivan Attack, a Taliban commander stated that "Iran supplies us with whatever we need." This same commander explained how he had been detained in Iran as an illegal laborer but was offered double his prior salary by the IRGC if he "went to work for them in Afghanistan." At that time, the IRGC was operating at least four Taliban training camps within Iran and was increasing its transportation of weapons and explosives into Afghanistan.

51. The emergence of a wing of the Islamic State ("ISIS") in Afghanistan in 2015 deepened Iran's desire to support the Taliban as a partner in the Iranian regime's ongoing battle against ISIS.

52. On May 21, 2016, then Taliban leader Mullah Akhtar Mohammed Mansour was killed by a drone strike at the Iran-Pakistan border. The Taliban's chief spokesman, Zabihullah Mujahid, subsequently stated that Mullah Mansour had been visiting Iran to fulfill "ongoing battle obligations."

53. Later in 2016, three IRGC-QF officers were killed in an American air strike against Taliban positions in the Farah province of Afghanistan.

54. Beyond direct military training and supplies, Iran has long served as a financial lifeline for the Taliban through its involvement in and enabling of the Taliban's illegal drug trafficking. Narcotics are the Taliban's greatest source of income. Iran assists in this financing by allowing its border with Afghanistan to be crossed by the Taliban and enlisting members of the IRGC in the transport and sale of large quantities of illicit drugs.

55. Iran's support for the Taliban is ongoing and accelerating. In September 2017, Department of Defense officials reported that Iran had recently increased its support of anti-American forces in Afghanistan, specifically including the Taliban.

56. On October 23, 2018, the Treasury Department announced the designation of eight individuals as a result of an international effort to curb Iran's illicit support for the Taliban. Among these individuals were:

- Mohammad Ebrahim Owhadi, as an IRGC-QF officer that reached an agreement in 2017 with a Taliban governor to ensure Iranian support for the Taliban in the Herat Province of Afghanistan. He was also involved in 2016 planning for a compound in Iran that would be used to house Taliban fighters and their families. In 2014, Owhadi was personally involved with distributing arms to Afghanistan on behalf of the IRGC-QF.

- Esma'il Razavi, who acted "for or on behalf of IRGC-QF and for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the Taliban." He was found to have personally encouraged and ordered the Taliban to carry out terrorist acts.

- Abdullah Samad Faroqui, the Taliban governor who conspired with Owhadi to further the training and support relationship between the Taliban and Iran. In early 2018, he personally received thousands of kilograms of explosives from the IRGC for distribution to Taliban commanders. He met with Iranian intelligence officials as early as 2006 to facilitate the supply of money and military equipment to the Taliban.

57. In November 2018, the United States Government announced its recovery of an Iranian-made drone in Afghanistan that had been launched from Iran and used to surveil Afghan and American military installations. At the same time, the United States also revealed Iranian-made rockets that were recovered directly from Taliban forces.

58. Taliban fighters continue to receive advanced military and tactical training from Iran in large numbers. Much of the training takes place inside of Iran, facilitated by the freedom of movement that Iran allows for Taliban fighters across its border. In exchange for this support, Iran demands that the Taliban to focus on particular targets, specifically including American personnel.

### C. The Camp Sullivan Attack

59. Camp Sullivan is located close to the Kabul International Airport. In January 2016 it was regularly used for housing embassy personnel and private civilian contractors. Adjacent to Camp Sullivan was a residential complex known as Darya Village that was used for the same purpose.

60. Ryan Hammons was employed as a private contractor for the United States Government in Afghanistan. As of January 4, 2016, he lived and worked within various buildings in Camp Sullivan and Darya Village.

61. Earlier that same evening, a truck containing more than three thousand pounds of explosive material was parked on the small road running between Camp Sullivan and Darya Village. At 6:34pm, the explosive material was detonated, causing a massive explosion.

62. The concrete barriers separating Darya Village and Camp Sullivan from the road were completely destroyed in the blast.

63. The crater left in the roadway was estimated to be as much as sixty feet wide and more than twenty feet deep.

64. Ryan Hammons was injured in the blast.

65. Official Taliban spokesman Zabihullah Mujahid claimed responsibility for the Camp Sullivan Attack on Twitter on behalf of the Taliban that same day.

## V. CAUSES OF ACTION

### COUNT I – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF RYAN HAMMONS (28 U.S.C. § 1605A(c))

66. Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

67. At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

68. Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

69. As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Ryan Hammons, is an expected and welcomed result of those actions.

70. Such conduct violates 28 U.S.C. § 1605A.

71. A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

72. The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

73. As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Ryan Hammons was injured in the Camp Sullivan Attack.

74. As a direct and proximate result of Iran's actions, Noree Kamkongkaeo and James Duncan have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Ryan Hammons's society and comfort.

75. Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

76. Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

77. Plaintiffs consist of immediate family members, and the functional equivalent thereof, of Ryan Hammons.

78. The Taliban's act of terrorism against Ryan Hammons was intentional and reckless, extreme and outrageous, and caused Plaintiffs to experience severe emotional distress.

79. The detonation of an explosive device by the Taliban violated acceptable norms of humane treatment under the laws of the United States and the acceptable norms of international law by which all civilized nations transact their affairs.

80. This act of terrorism was extreme and outrageous, perpetrated with the intent to intimidate and coerce.

81. Iran, through its influence with the Taliban, knowingly and willfully provided material support, training, and direction to this act of terrorism, with the express purpose of causing severe injury or death to the victims and intimidating others.

82. Iran knew, or reasonably should have known, that this terrorist act and others like it would cause severe emotional distress to the family members of those who were attacked.

83. Therefore, Iran is responsible for the damages suffered by Plaintiffs as a direct and proximate result of the terrorist attack on Ryan Hammons.

84. Because Iran acted in a willful and wanton manner, showing a conscious disregard for the rights of others, Plaintiffs request an additional award of punitive damages.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award damages to Plaintiffs against Iran on all Counts, and grant Plaintiffs:

a. Solatium damages in a total amount of $13,000,000, comprised of the following sums:

   - $8,000,000 on behalf of Noree Kamkongkaeo, partner, and functional equivalent to a spouse, of Ryan Hammons;

   - $5,000,000 on behalf of James Duncan, uncle, and functional equivalent of a father, of Ryan Hammons;

b. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to Ryan Hammons (in related litigation), Noree Kamkongkaeo, and James Duncan;

c. Interest, from January 4, 2016 until the date of judgment; and

d. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Dated: April 22, 2020

Respectfully submitted,

/s/ Kevin A. Hoffman__
Randy D. Singer (DCD Bar No. VA057)
Kevin A. Hoffman (DC Bar No. 1044559)
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, VA 23451
Phone: (757) 301-9995
Fax: (757) 233-1084
Email: randy.singer@singerdavis.law
Email: kevin.hoffman@singerdavis.law
*Counsel for Plaintiffs*